| | | |
|---|---|---|
| BENJAMIN B. BLANCHET AND<br>ANNE B. BLANCHET | * * * | 15TH JUDICIAL DISTRICT COURT |
| VERSUS | * * | DOCKET NO. 96178 |
| HENRY ALBERT BOUDREAUX, JR.,<br>HSB DESIGN & CONTRACTORS, LLC,<br>ABC INSURANCE COMPANY, ABC2<br>INSURANCE COMPANY, XYZ<br>INSURANCE COMPANY, AND XYZ2<br>INSURANCE COMPANY | * * * * * * | PARISH OF VERMILION<br><br>STATE OF LOUISIANA |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## FIRST AMENDED AND RESTATED
## PETITION FOR DAMAGES AND DECLARATORY RELIEF

NOW INTO COURT, through undersigned counsel, come BENJAMIN B. BLANCHET and ANNE B. BLANCHET ("Petitioners"), residents of the full age of majority of Vermilion Parish, Louisiana, who respectfully represent:

1.

Made Defendants herein are:

a. HENRY ALBERT BOUDREAUX, JR., ("Boudreaux") a resident of the full age of majority of Lafayette Parish, State of Louisiana;

b. HSB DESIGN & CONTRACTORS, LLC (A.K.A. HENRY A. BOUDREAUX ARCHITECTS AND CONTRACTORS, LLC), a Louisiana limited liability company ("HSB") domiciled at 614 Madison Street, Lafayette, LA 70501, which may be served through its registered agent, Jeremy A. Hebert, at 910 Harding Street, Lafayette, LA 70503;

c. ACCIDENT INSURANCE COMPANY, INC., a South Carolina Corporation that issued Commercial General Liability Insurance policy number AGL9005020 to Henry A. Boudreaux;

d. ABC2 INSURANCE COMPANY, the unknown liability insurer of HSB Design & Contractors, LLC;

e. XYZ INSURANCE COMPANY, the unknown errors and omissions insurer of Henry A. Boudreaux; and

f. XYZ2 INSURANCE COMPANY, the unknown errors and omissions insurer of HSB Design & Contractors, LLC,

(collectively, the "Defendants").

2.

Venue is proper in Vermilion Parish based on Louisiana Code of Civil Procedure articles 74 and 76.1, because by agreement of the parties, work or services were to be, and were,



performed in Vermilion Parish, and Defendants' wrongful conduct occurred, and damages were sustained, in Vermilion Parish.

## Facts

3.

Petitioner's home, in Meaux, Louisiana, was originally built in the 1840's, and located in the vicinity of mature live oak trees, creating a unique setting for a home. Those oaks are now some 200 years old. The home itself is a relic of Acadian architecture in remarkable condition for its age, preserved for generations by Petitioners' ancestors. Its beauty and historical significance are rare indeed.

4.

Petitioners desired to enhance this museum of Louisiana architecture by adding, in addition to a large kitchen and bedroom wing, a music room to house a custom built organ commissioned by internationally acclaimed organ builder, Fritz Noack. To ensure they captured the beauty of the site, antiquity of the home, and presence of the organ, Petitioners flew Mr. Noack to the site on several occasions.

5.

The improvements to Petitioners' home, in particular the music room and its special amenities were intended to gratify Petitioners' love of music, a nonpecuniary interest Boudreaux and HSB were aware of from their first involvement with the renovations. Other areas were uniquely planned to meet Petitioners' desire to preserve the historical integrity of the home, not only for Petitioners themselves, but for generations to come.

6.

Petitioners initially retained Barron and Toups Architects from New Orleans to design the major addition to their historic Acadian home. Barron and Toups prepared a complete set of architectural drawings and specifications to construct the renovations and improvements to the home. Of particular importance to Petitioners, the architectural firm created elaborate and detailed foundation plans in an effort to preserve the property's oak trees.

7.

Petitioners retained Robert Romero together with his companies, Compagnie Romero, L.L.C. and Robert J. Romero Associates, Inc., as the general contractor to build the renovations and improvements.

8.

During the summer of 2010, Petitioners became acquainted with Boudreaux socially. Over dinner one evening and generally excited about their renovation, Petitioners showed Boudreaux the plans prepared by Barron and Toups. Boudreaux advised Petitioners that the plans created by Barron and Toups would irreparably harm the property's oak trees and would not be in keeping with the historic Acadian style of the home. As a friend, Boudreaux was in a special relationship of confidence that afforded him the Petitioners' trust.

9.

Boudreaux also represented that he had expertise in historic Acadian and Louisiana architecture, allowing him to better design the renovation and the foundation to conform with the historical portion of the home. He further represented that his design would be significantly less expensive while better preserving the oak trees. Upon information and belief, Boudreaux made both misrepresentations to knowingly deceive the Petitioners in order to obtain the unjust advantage of becoming both architect and contractor on Petitioners' home, individually and on behalf of HSB, to the detriment of Petitioners, Barron and Toups, and Robert Romero.

10.

Between approximately September 2010 and March 2011, Boudreaux was retained to provide a workable proposal for the addition's foundation, to modify the floor plan to move construction further from an oak tree, and to provide suggestions for making the addition more compatible with the historic structure. He was paid at an agreed upon rate of $110 per hour. Boudreaux kept track of his own time for his services and periodically sent invoices to Petitioners. Petitioners subsequently discovered that Boudreaux grossly overcharged Petitioners, frequently counting the same time twice and representing that he worked hours when he did not.

11.

Boudreaux advised Petitioners that, in his professional opinion, if they continued to use Romero as general contractor on their project, Petitioners would overpay for their construction and receive an inferior product. In January 2011, Petitioners requested that Boudreaux prepare a timeline to complete construction of the improvements and to calculate the likely cost to complete the renovation if Boudreaux were hired to replace Romero as general contractor.

12.

In March 2011, based on Boudreaux's $1.2 million cost of completion estimate and projected Thanksgiving completion date timeline, Petitioners hired Boudreaux to further design, supervise and construct (collectively, the "Services") the renovation of, and additions to, their home (the entirety of all work related thereto, the "Project"). Because of Boudreaux's representations, Petitioners dismissed Barron and Toups and Robert Romero, making Boudreaux both architect and general contractor.

13.

Boudreaux, as a licensed architect and contractor, provided Petitioners with an American Institute of Architects design/build contract in contemplation of his work designing and constructing the renovation and addition to Petitioners' home. The Parties met with attorney Frank Slavich, who drafted an addendum to the AIA contract, setting out the details of the Parties' arrangement. Orally, the parties agreed on the budget Boudreaux and HSB prepared for the Project and the AIA agreement, as modified by the Slavich addendum. The Parties agreed to sign the documents upon Boudreaux providing a written copy of the budget to attach as Schedule 1 to the addendum. Boudreaux never provided the written copy, so the documents were never signed.

14.

The parties all agreed that Petitioners would pay Boudreaux the actual cost of the labor and materials incurred and, for his services as both architect and contractor, $200,000, with the opportunity to earn a $50,000 bonus if the Project were completed on time, and an additional $50,000 bonus if it were completed on budget. These payments for services were in addition to

the hourly fees that had already been paid Defendants. The parties also agreed that Boudreaux would receive a 12% commission of budget increases for the project to the extent that the actual costs exceeded $1.3 million, but only if the increased costs resulted from preapproved change orders and not from cost overruns.

15.

In addition to the work that constitutes the Project, the parties anticipated that there would be additional work to the existing home. For that work, Defendants would be entitled to a fee of 12% of the actual, third-party costs of that additional work. The additional work would not be considered in determining whether Defendants would be entitled to bonuses based on meeting the agreed timeframe or budget.

16.

As the Project progressed, numerous design and construction problems ensued. Much of the work had to be reinstalled, and expensive materials had to be reordered, all at a significant cost to Petitioners.

17.

Petitioners learned that certain materials installed were not of the quality set out in Defendants' specifications and representations to Petitioners. Yet in many cases, Petitioners were charged and paid for higher quality materials than were actually utilized.

18.

Despite their many efforts to work with Boudreaux, Petitioners eventually terminated Defendants' services so that the home could finally be completed—something Defendants had been unsuccessful in achieving.

19.

Following termination, in an effort to address resolving the financial obligations of the parties to one another, Petitioners learned, for the first time, that the charges submitted to Petitioners by Defendants for subcontractor work and materials were not the actual costs of the goods and services from the subcontractors and materialmen, as agreed by the parties, but, instead, had been marked up by Defendants in amounts yet unknown to Petitioners. Defendants

overbilled for hourly wages and additionally drew funds for his own services in excess of the amounts agreed to by the Parties. Boudreaux charged and the Petitioners unknowingly paid for services that were never rendered, hours that were never worked, materials that were either never ordered or that were delivered, upon information and belief, to Boudreaux's own home, commissions that were expressly renounced in the agreement between the parties, plus various other markups, including approximately $250,000 that Boudreaux now alleges he charged Petitioners as a reimbursement of Boudreaux's personal income tax liability. Defendants have refused to account for these improper markups. As a result, Defendants have been paid what on information and belief amounts to over $1 million in excess charges.

20.

Boudreaux's actions cumulatively and individually violate the Rules and Statutes applicable to architects and contractors in Louisiana, including, without limitation, Louisiana State Board of Architectural Examiners Rules and Regulations Chapter 19 § 1901(B), Louisiana Revised Statute 37 § 141, et seq., and Louisiana Revised Statute 37 § 2150, et seq.

### Count 1
### Misrepresentations Regarding Hourly Billing

21.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

22.

Between approximately September 2010 and March 2011, Boudreaux was retained at a rate of $110 per hour to provide architectural and consulting services.

23.

Boudreaux kept track of his own time for his services and periodically sent invoices to Petitioners. Boudreaux knowingly overcharged Petitioners, frequently representing that he worked hours when he did not.

24.

Boudreaux failed to disclose to Petitioners that he was charging for hours that he did not work. Boudreaux separated billed hours to span multiple invoices so that any excessive billed time was documented weeks apart, suppressing the information from the Petitioners.

25.

Boudreaux's actions were intended to obtain an unjust advantage for himself to the detriment of Petitioners by charging more than the amount actually earned.

## Count 2

### Misrepresentations Regarding Billing For Materials

26.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

27.

Beginning in late September 2010 and ending upon termination of his services, Boudreaux volunteered to order materials for Petitioners' home, claiming he had access to authentic materials that were unavailable to others. By interposing himself in the ordering process and concealing the documentation produced from the suppliers, Boudreaux put himself between the suppliers and Petitioners, allowing him to control the information about the cost of goods provided.

28.

Boudreaux agreed that all materials would be delivered to Petitioners at the cost Boudreaux paid. Boudreaux knowingly charged Petitioners for materials that were never ordered and charged for larger quantities of materials than were actually delivered.

29.

Boudreaux knowingly and intentionally marked up the invoices from his suppliers, making exorbitant profits on materials despite agreeing to provide all materials at cost. Boudreaux suppressed the costs charged by his suppliers and misrepresented that he was charging Petitioners the same amount that he paid in order to make his misrepresentations undetectable. To further suppress the cost and prevent the Petitioners from discovering his acts,

Boudreaux provided the misrepresented amounts for use and signature in all lien waivers signed by materialmen.

30.

Boudreaux's actions were part of a scheme to obtain an unjust advantage for himself to the detriment of Petitioners by submitting invoices in excess of the amounts that Petitioners agreed to pay and charging Petitioners for products that were never received.

### Count 3
### Misrepresentations Regarding Billing For Services

31.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

32.

As a consultant and then as general contractor, Boudreaux ordered services from various subcontractors. By interposing himself in the contracting process and concealing the documentation produced from the subcontractors, Boudreaux put himself between the subcontractors and Petitioners, allowing him to control the information about the cost and quality of the services provided.

33.

Boudreaux agreed that all subcontracted services would be delivered to Petitioners at the cost Boudreaux paid. Boudreaux knowingly charged Petitioners for services that were never rendered and misrepresented the quality of services to be delivered.

34.

Boudreaux knowingly and intentionally marked up the invoices from his subcontractors, making a profit on labor despite agreeing to provide all subcontracted services at cost. Boudreaux suppressed the costs charged by his subcontractors and misrepresented that he was charging Petitioners the same amount that he paid in order to make his misrepresentations undetectable. To further suppress the cost and prevent the Petitioners from discovering his acts, Boudreaux provided the misrepresented amounts for use and signature in all lien waivers signed by subcontractors.

35.

Boudreaux's actions were part of a scheme to obtain an unjust advantage for himself to the detriment of Petitioners by submitting invoices in excess of the amounts that Petitioners agreed to pay and charging Petitioners for services that were never received.

### Count 4
### Misrepresentations Regarding Quality of Materials

36.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

37.

Boudreaux represented to Petitioners that he could get materials that were superior to those that Robert Romero could deliver or that Petitioners could order on their own because of Boudreaux's out of town or out of state connections. The actual materials ordered were from local suppliers and were unremarkable. By interposing himself in the ordering process and concealing the documentation produced from the suppliers, Boudreaux put himself between the suppliers and Petitioners, allowing him to control the information about the quality of goods provided.

38.

In many instances, Boudreaux quoted and invoiced Petitioners for higher quality products than those actually delivered. Upon information and belief, Boudreaux advised the Petitioners that he was going to purchase higher quality materials, actually ordered lower quality materials, and kept the difference in price. Boudreaux knowingly misrepresented the quality of the materials to be delivered, although the design plans included the higher quality materials. Boudreaux failed to correct his designs to represent the different products, making some of the designs incorrect, defective, or deficient.

39.

Boudreaux knowingly and intentionally suppressed the costs charged by and the products ordered from his subcontractors and misrepresented the actual products delivered to Petitioners in order to make his misrepresentations undetectable. To further suppress the cost and prevent

the Petitioners from discovering his acts, Boudreaux provided the misrepresented amounts for use and signature in all lien waivers signed by materialmen.

40.

Boudreaux's actions were part of a scheme to obtain an unjust advantage for himself to the detriment of Petitioners by submitting invoices for better products than those received by Petitioners but still charging the same amount. Some of the substitutions required changes in the design that Boudreaux never performed, so the products are now defective or deficient and must be either repaired or replaced.

## Count 5
### Misrepresentations Regarding Delivery

41.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

42.

As a consultant and then as general contractor, Boudreaux ordered services from various subcontractors and materials from various suppliers. By interposing himself in the contracting and ordering processes and concealing the documentation produced from the subcontractors and suppliers, Boudreaux put himself between the subcontractors and suppliers and the Petitioners, allowing him to control the information about the services and materials provided.

43.

Upon information and belief, materials that were delivered to Boudreaux's home were billed to Petitioners. Upon information and belief, Petitioners were billed for labor performed by subcontractors at Boudreaux's home.

44.

The delivery tickets and invoices that would allow the Petitioners to ascertain that the products were not actually received or services actually rendered were intentionally concealed from Petitioners, making the misrepresentations undetectable.

45.

Boudreaux's actions were part of a scheme to obtain an unjust advantage for himself to the detriment of Petitioners by charging Petitioners for services and materials that were never received.

### Count 6

### Violation of Duty as an Architect

46.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

47.

As an architect, Boudreaux and HSB had a duty to disclose in writing to the Blanchets, the nature of any business association or direct or indirect financial interest substantial enough to influence his judgment in connection with the performance of his professional services. See The Louisiana State Board of Architectural Examiner Rules, Section 1901(B)(2).

48.

Boudreaux and HSB violated their duty to the Petitioners by failing to disclose in writing the misrepresentations regarding billing for materials and services (both amounts and quality), each substantial enough to influence Boudreaux's judgment in connection with the performance of his professional services.

49.

Boudreaux's judgment as an architect was influenced by the amounts of money he could make by specifying materials and services for Petitioner's home. Petitioner received compromised materials and services yet paid premium prices for materials and services, to Defendants' benefit and at an unreasonable cost to Plaintiffs.

50.

Boudreaux exaggerated his degree of responsibility on prior assignments in violation of The Louisiana State Board of Architectural Examiner Rules, Section 1901(C)(3).

## Count 7

### Errors and Omissions Insurance

51.

Among other things, Boudreaux and HSB specifically charged Petitioners for professional liability and errors and omissions insurance premiums. On two separate occasions, Defendants invoiced for and were paid what was represented as professional liability, or errors and omissions insurance.

52.

In truth and in fact, neither Boudreaux nor HSB ever obtained professional liability or errors and omissions insurance. The invoices to the Petitioners were intentionally fabricated to swindle more funds out of Petitioners.

53.

Defendants are fully responsible for the return of all monies paid by Petitioners for professional liability or errors and omissions insurance.

## Count 8

### Defective Design

54.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

55.

Upon information and belief, Defendants defectively designed certain renovations, improvements and construction, causing huge delays and cost overruns, necessitating the reordering and installation of materials and supplies, incurring unnecessary and duplicated labor, resulting in a product unlike what Petitioners requested and Defendants agreed to provide. In certain cases the product designed by Defendants was, or is, not functional at all or has been compromised in function. As a result, many of the renovations are functionally deficient.

56.

Defendants failed to provide detailed drawings to ensure that what was constructed comported with what Petitioners requested. Upon changing products, materials, and fixtures,

Defendants failed to correct his designs to reflect the different products, causing defective or deficient installation. Defendants would often provide plans the day of installation or construction by sketching on scrap paper or on the walls of the construction site.

57.

Defendants failed to provide a mechanical plan, an electrical plan and other specifications required for the work comprising the Project.

58.

Defendants designed, ordered and supplied inappropriate (in size, quantity, quality, or preference) or defective materials and products for the Project, causing a deviation from Petitioners' requested, or Defendants' designed, specifications, lack of workmanlike construction, and defects that render the things so inconvenient that Petitioners would not have utilized the design or materials had they known of the problems. These defects in design resulted even though Petitioners had provided Boudreaux/HSB with thorough detailed information, such as the dimensions of every drawer and cabinet in the kitchen, the particulars of appliances selected, or the size of the organ being built.

## Count 9

### Negligent and Defective Construction

59.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

60.

Defendants defectively constructed the home, requiring the rebuilding of many items, reordering materials, incurring unnecessary labor costs and causing numerous flaws, water leaking and damage issues, unpleasant and unnecessary sounds, unsightly cosmetics, inadequate insulation, moisture problems, and other defects in workmanship and deviations from the agreed specifications, and loss of use of several areas in the home.

### Count 10

### Negligent Supervision

61.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

62.

In addition to Defendants' negligent design and construction, Defendants negligently supervised the design, construction and management of the Project causing defects, flaws, and damages to Petitioners and the Project, extra materials to be required, extra materials being ordered but not used, materials and supplies disappearing from the site, and other damages.

63.

In one instance where work was done in direct contravention of specific instructions by Petitioners prior to their leaving town on vacation, when asked why the changes were made, Boudreaux responded that the worker he was to be supervising made the changes while he was at lunch.

### Count 11

### Breach of Contract

64.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

65.

Defendants agreed to charge Petitioners for the actual costs of goods, materials and services charged by suppliers, laborers and subcontractors plus a specified profit and an opportunity to make two bonuses. Without any notice to, much less an agreement by, Petitioners, Defendants charged Petitioners amounts far in excess of the actual costs incurred. Defendants have breached their contract with Petitioners, and Petitioners have paid for much more than was due to Defendants.

66.

Boudreaux and HSB charged for hours of labor and services agreed to but not actually delivered.

67.

Due to Defendants' breaches, Petitioners are entitled to terminate their agreement with Defendants, recover damages against Defendants, and have the court declare that they have no further obligations to Defendants under any contract or otherwise.

### Count 12

### Obligation to Restore

68.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

69.

In addition to and separate from the agreement between the parties, Defendants charged Petitioners and Petitioners paid to Defendants money intended to satisfy obligations that did not exist. Defendant represented that these amounts were owed for hours not worked, services not performed, and products not delivered.

70.

Petitioners paid the sums invoiced by Defendants without knowledge of Defendants' misrepresentations. These debts were in truth and in fact obligations that did not exist, and Petitioners' payments to Defendants were payments of sums not owed.

71.

Petitioners are entitled to a return of all payments made for sums not owed and for all interests, fruits, and products of those payments.

### Count 13

### Unjust Enrichment

72.

Petitioners reassert the facts and allegations set forth in the preceding paragraphs.

73.

Alternatively, should the court find there was no agreement between the Parties, Defendants have been unjustly enriched without cause at Petitioners' cost for which Defendants

are liable to Petitioners. Defendants have received payments not owed to them and are bound to restore them to Petitioners.

### Damages

74.

As a result of Defendants' actions, the Petitioners have suffered each of the following damages for which Defendants are solidarily indebted to Petitioners: (a) Payment for hours of labor not worked; (b) Payment for materials and services that were not provided; (c) Payment for quantities of materials and service in excess of those provided; (d) Payment for higher quality materials than those provided; (e) Inferior quality of materials; (f) Damages resulting from replacing items switched with inferior products; (g) Increased construction costs; (h) Increased labor costs; (i) Damages resulting from the use of improper materials and nonconforming products; (j) Damages resulting from defective design; (k) Damages resulting from defective workmanship; (l) Damages for lost materials and supplies; (m) Damages resulting from ordering excessive materials and supplies; (n) Delay to the Project from Defendants' actions and inactions; (o) Loss of use of their property; (p) Payment for goods and services in amounts in excess of the actual costs of such goods and services; (q) Payment for goods and services, all or a portion of which should be returned by Defendants to Petitioners; (r) Payment of $200,000 that was not earned at all or a portion of which should be returned by Defendants to Petitioners; (s) Payment for hourly fees, all or a portion of which should be returned by Defendants to Petitioners; (t) Payment of professional liability and errors and omissions insurance; (u) Damage to the historical integrity and value of the home; (v) Mental anguish; (w) Emotional Distress; (x) Damages for nonpecuniary loss; (y) Inconvenience; (z) Consequential damages; and (aa) Attorney fees.

WHEREFORE, Petitioners, BENJAMIN B. BLANCHET and ANNE B. BLANCHET, pray that the Defendants be served with this Petition, and after being duly cited to appear and answer the same and the expiration of all legal delays and due proceedings are had, that there be judgment rendered in favor of the Petitioners, BENJAMIN B. BLANCHET and ANNE B. BLANCHET, and against Defendants, HENRY A. BOUDREAUX, HSB DESIGN &

CONTRACTORS, LLC, ACCIDENT INSURANCE COMPANY, INC., ABC2 INSURANCE COMPANY, XYZ INSURANCE COMPANY, and XYZ2 INSURANCE COMPANY in solido, for their damages pursuant to the evidence and in accordance with the law, for each of the following:

1. Payment for hours of labor not worked;
2. Payment for materials and services that were not provided;
3. Payment for quantities of materials and service in excess of those provided;
4. Payment for higher quality materials than those provided;
5. Inferior quality of materials;
6. Damages resulting from replacing items switched with inferior products;
7. Increased construction costs;
8. Increased labor costs;
9. Damages resulting from the use of improper materials and nonconforming products;
10. Damages resulting from defective design
11. Damages resulting from defective workmanship
12. Damages for lost materials and supplies;
13. Damages resulting from ordering unnecessary or excessive supplies;
14. Delay to the Project from Defendants' actions and inactions;
15. Loss of use of their property;
16. Payment for goods and services in amounts in excess of the costs of such goods and services;
17. Return of all or a portion of the purchase price for certain goods and services;
18. Return of all or a portion of the $200,000 fee paid to Boudreaux/HSB;
19. Return of a portion of the hourly fees paid to Boudreaux/HSB;
20. Damage to the historical integrity and value of the home;
21. Payment for professional liability and errors and omissions insurance;
22. Mental anguish;

23. Emotional distress;

24. Damages for nonpecuniary loss;

25. Inconvenience;

26. Consequential damages; and

27. Attorneys' fees,

together with legal interest thereon from the date of the earlier of breach of contract or judicial demand, until fully paid, for all costs of these proceedings, and for all general and equitable relief to which they may be entitled. Further, Petitioners pray that the court declare that they have no further obligations to Defendants under any contract or otherwise.

Respectfully submitted,

PERRET DOISE L.L.C.

By: *Hank Perret*

HENRY C. PERRET, JR., #10514
1200 Camellia Blvd., Ste. 220 (70508)
P. O. Box 53789
Lafayette, LA 70505
Telephone: (337) 593-4900
Facsimile: (337) 593-4910

Attorneys for BENJAMIN B. BLANCHET and ANNE B. BLANCHET

Please serve:

Henry Albert Boudreaux, Jr.
HSB Design & Contractors, LLC
Through their attorney of record:
J. McCaleb Bilbro
The Javier Law Firm, LLC
2010 Energy Centre
1100 Poydras Street
New Orleans, LA 70163

Accident Insurance Company, Inc.
Through its Agent for Service of Process:
Louisiana Secretary of State
8585 Archives Ave.
Baton Rouge, LA 70809